| |
|---|
| **Clark v Martin** |
| 2024 NY Slip Op 33457(U) |
| September 26, 2024 |
| Supreme Court, Kings County |
| Docket Number: Index No. 5085/15 |
| Judge: Ellen M. Spodek |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

At an IAS Term, Part 63 of the Supreme
Court of the State of New York, held in and
for the County of Kings, at the Courthouse, at
Civic Center, Brooklyn, New York, on the
26th day of September, 2024.

P R E S E N T :

HON. ELLEN M. SPODEK,
                              Justice.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
KENNETH CLARK and SARDE CLARK, AS
Co-Administrators of the Estate of CHANNEL
CLARK, deceased,

                                        Plaintiffs,

                 - against -

DEAN MARTIN, NADIA PILE, KAJAL PRUTHI,
BROOKDALE HOSPITAL MEDICAL CENTER, and
NEW YORK METHODIST HOSPITAL,

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**DECISION/ORDER/JUDGMENT**

Index No. 5085/15

Mot. Seq. Nos. 8, 10-11

The following e-filed papers read herein:                    NYSCEF Doc Nos.:

Notice of Motion/Cross Motion, Affirmations (Affidavits),
   and Exhibits Annexed . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    139-196; 222-245; 247-265
Affirmations (Affidavits) in Opposition
   and Exhibits Annexed . . . . . . . . . . . . . . . . . . . . . . . . . . . .    274-287; 289-302; 303-316; 317
Reply Affirmations and Exhibits Annexed . . . . . . . . . . . . . . .    319-337; 338; 339

In this action to recover damages for (among other things) medical malpractice and

wrongful death, defendants Nadia Pile, M.D. (sued herein as Nadia Pile) ("Dr. Pile"), and

Dean Martin, M.D. (sued herein as Dean Martin) ("Dr. Martin"), separately; and Kajal

Angras, M.D. (sued herein as Kajal Pruthi) ("Dr. Pruthi"), and New York-Presbyterian-

Brooklyn Methodist Hospital (sued herein as New York Methodist Hospital) ("Methodist")

jointly, move for summary judgment dismissing the Verified Amended Complaint, dated

June 8, 2022 (NYSCEF Doc No. 145), as against each of them.[1]

---

[1] The remaining defendant, Brookdale Hospital Medical Center, was dismissed from this action without opposition
by Decision & Order, dated June 25, 2024 (NYSCEF Doc No. 340).

[* 1]

Plaintiffs Kenneth Clark and Sarde Clark, as the co-administrators of the estate of Channel Clark, deceased ("plaintiffs"), do not oppose those branches of defendants' motions which seek summary judgment dismissing plaintiffs' second, third, and fourth causes of action sounding in lack of informed consent, negligent hiring/retention, and negligent credentialing, respectively. *See Clarke v New York City Health & Hosps.*, 210 AD3d 631, 633 (2d Dept 2022); *Carcia v Greif*, 182 AD3d 464, 466 (1st Dept 2020); *Wright v Morning Star Ambulette Servs., Inc.*, 170 AD3d 1249, 1252 (2d Dept 2019). Moreover, plaintiffs, in opposing defendants' motions, have abandoned their claims as against Dr. Pruthi who was Methodist's resident at the time. The remainder of this Decision/Order/Judgment addresses plaintiffs' first and fourth causes of action sounding in medical malpractice and wrongful death, respectively, as against Dr. Pile, Dr. Martin, and Methodist (collectively, "defendants").

## Background

On June 25, 2012, plaintiffs' decedent, Channel Clark (the "patient"), was seen and examined by nonparty Nurse Practitioner Audrey Stedford ("Nurse Stedford") at Dr. Martin's Ob/Gyn private practice for her first pre-natal appointment. She was then seven weeks pregnant. She had a history of three prior pregnancies, resulting in two live births and one miscarriage. Her blood pressure, on presentation to Dr. Martin's practice, was significantly elevated at 164/109. She was morbidly obese with a BMI of 38, based on her weight of 259 pounds and her height of 69 inches. Nurse Stedford noted that the patient's pregnancy was high risk because of her morbid obesity, chronic hypertension,

[* 2]

and idiopathic thrombocytopenia (low platelet count). At Nurse Stedford's recommendation, the patient immediately went to Methodist's Labor & Delivery emergency room ("Methodist's ER") for treatment of her high blood pressure. At Methodist's ER, the patient's systolic blood pressure was elevated at 146/84. The patient, however, "[l]eft [Methodist's ER] [w]ithout [b]eing [s]een" by any healthcare provider other than the triage nurse.

On July 18, 2012, the patient presented to Methodist's outpatient Maternal Fetal Medicine clinic ("Methodist's MFM clinic") where she was seen and examined by nonparty Jacqueline Bush, M.D. ("Dr. Bush"). The patient's blood pressure, at the time, was significantly elevated at 160/100 and (on re-measurement) at 162/100. Dr. Bush gathered from the patient's medical history that the patient had been suffering from chronic hypertension for approximately six years since the birth of her second child in 2006. Dr. Bush recommended that the patient immediately go to Methodist's ER because her antihypertensive medication at the time – Aldomet – was inadequate to control her blood pressure. Because the patient declined Dr. Bush's recommendation to visit Methodist's ER, Dr. Bush instructed the patient to return to Dr. Martin's practice as soon as possible, to monitor her blood pressure at home, and to return to Dr. Bush at Methodist's MFM clinic in one week. The patient, at the time, failed to follow up with Dr. Bush.

Approximately one month later on August 14, 2012, the patient returned to Dr. Martin's practice where she was seen and examined by Nurse Stedford. Her systolic blood pressure was borderline hypertensive at 130/70 at the time. Nurse Stedford's plan

3

for the patient with a "high risk" pregnancy was "management by [a] high risk [pregnancy] specialist," (*i.e.*, Dr. Bush at Methodist's MFM clinic).

Two weeks later on August 28, 2012, the patient visited Dr. Martin's practice where she was seen and examined by Dr. Martin. Her blood pressure, at the time, was under control at 126/80. She was continued on Aldomet.

On September 21, 2012, the patient again returned to Dr. Martin's practice where she was seen and examined by Nurse Stedford. Her blood pressure, at the time, was significantly elevated at 150/102. She reported as "having family problems." At Nurse Stedford's insistence, the patient went to Methodist's ER immediately.

For approximately two weeks from September 21, 2012 to September 25, 2012, the patient was hospitalized at Methodist for chronic hypertension, low platelet count, and elevated liver enzymes. While hospitalized at Methodist, she was seen and consulted at bedside by the specialists from the hematology, cardiology, and MFM clinics. Her Aldomet (an older, narrow-spectrum antihypertensive agent) was replaced with Labetalol (a newer, wide-spectrum antihypertensive agent). While on Labetalol, the patient's blood pressure returned to normal baseline by the time of her discharge from Methodist. Her discharge diagnoses were chronic hypertension and low platelet count. At discharge, she was instructed to follow up with Dr. Martin's practice and with Methodist's outpatient hematology clinic.

On October 5, 2012, the patient was seen at Methodist's outpatient hematology clinic for continued treatment of her low blood count with a steroid. The patient's blood

4

[* 4]

pressure, at the time, was once again significantly elevated at 185/116. She also had a bilateral "1+" pitting edema." Although she was given a Labetalol tablet in the hematology clinic, her blood pressure failed to drop. Because of the persistent hypertension, Methodist's hematology clinic referred the patient to Methodist's ER for evaluation.

She immediately went to Methodist's ER as instructed. There, her blood pressure readings were significantly elevated at 174/105, 158/103, and 171/107. She reported, by way of her medical history, that her blood pressure readings had been as high as in excess of 200/100 before her current pregnancy. She was examined in Methodist's ER by Dr. Bush (an MFM specialist) then on duty. According to Dr. Bush's note, she doubted that the patient was suffering from "superimposed preeclampsia at [that] time" because her preeclamptic laboratory results were negative. To manage the patient's intractable hypertension, Dr. Bush doubled the dose of the patient's Labetalol from 200 mg twice daily to 400 mg twice daily and recommended a repeat urinalysis. After a three-hour stay in Methodist's ER, the patient was discharged home the same day with instructions to take the newly increased dose of Labetalol, to repeat urinalysis, and to follow up as an outpatient (which she never did) with a nephrologist.

On October 9, 2012, the patient returned to Dr. Martin's practice where she was seen and examined by Dr. Pile, an employee physician of Dr. Martin's practice. The patient's blood pressure, once again, was significantly elevated at 185/110. Dr. Pile explained to the patient that she needed to take two (not one) 200 mg tablets of Labetalol

5

at the same time twice daily to make up for the increased 400 mg dose of Labetalol twice daily. The patient was instructed to follow up with a nephrologist and with Dr. Bush at Methodist's outpatient clinics, as well as to return to Dr. Martin's practice in three weeks.

On November 9, 2012, the patient returned to Dr. Martin's practice where she was seen and examined by Dr. Martin. Her blood pressure, at the time, was within the normal range of 127/84. She was instructed to return to Dr. Martin's practice in three weeks.

On November 30, 2012, the patient presented to Dr. Martin's practice after an earlier, same-day visit to Methodist's hematology clinic where her blood pressure was measured at 179/111. At Dr. Martin's practice, she was seen (but was not examined) by Nurse Stedford. Although the patient's blood pressure remained significantly elevated, the patient "did not want to be evaluated by [Nurse Stedford]." Although Nurse Stedford insisted that the patient go to Methodist's ER immediately, the patient refused to do so.

On January 2, 2013, the patient visited Dr. Martin's practice where she was seen and examined by Dr. Pile. The patient's blood pressure, at the time, was within the normal range of 135/82. She was five weeks and four days away from her due date of February 10, 2013. Dr. Pile discussed preterm labor precautions with the patient and instructed her to return to Dr. Martin's practice in two weeks.

Ten days later on January 12, 2013 at 12:30 a.m., the patient presented to (the since-dismissed defendant) Brookdale Hospital Medical Center ("Brookdale"), with a hypertensive urgency. Her blood pressure in the triage was 168/130 and (on repeat) 175/120, despite her having taken Labetalol at 10:30 p.m. the night before. Further, she

6

[* 6]

exhibited bilateral lower extremity pitting edema. Less than one hour after her presentation to Brookdale's ER, however, the patient left against medical advice. The Brookdale ER staff explained to the patient that her extremely high blood pressure could cause her to suffer a stroke, resulting in damage both to her and her fetus. The patient informed the Brookdale ER staff that she understood the risks, and that she would take a taxi to Methodist's ER. At 1:17 a.m. on January 12, 2013, the patient signed out of Brookdale's ER against medical advice but, contrary to her assurances to the ER staff, she did not immediately go to Methodist.[2]

Three days later on January 15, 2013 at 8:17 a.m., the patient presented to Methodist's ER with a hypertensive emergency. At triage, the patient complained of the "acute onset of dyspnea, epigastric pain, diaphoresis and non-productive cough that started earlier [in the day] after she dropped off [her] daughter at school." By 8:20 a.m., Dr. Pruthi (Methodist's resident then on duty in the ER), together with the attending obstetrician, were at the patient's bedside. The patient's blood pressure was then catastrophically high at

---

[2] According to the Brookdale ER records:

"[The patient] called the ambulance because her blood pressure was very high. Patient stated [that] she got into an altercation with her boyfriend earlier [that night], found out he was being unfaithful. . . . [The] patient states [that] she has a blood-pressure monitor at home and the [that her] blood pressure was 120/70s the day before. Blood pressure in triage [is] 168/130, [at] repeat [is] 175/120, [her] heart rate [is] 128 [beats per minute, which is tachycardic]. [The] patient [presents] with pitting edema . . . ([which has] worsen[ed] today as per [the] patient). [The] patient refused vaginal exam. [The] patient appears very anxious, she is short of breath. She is upset that the ambulance brought her [to Brookdale] and wants to sign out against medical advice. [The ER staff] explained [to her] that a blood pressure this high could give her a stroke if no[t] treated; [could] caus[e] her death and [her] baby's death as well. [The] patient is aware of the risks, and stated she will take a taxi to Methodist. [The] patient signed out against medical advice."

Brookdale ER records, page 2 of 3 (NYSCEF Doc No. 265) (abbreviations spelled out and typographical errors corrected).

201/135, and her heart rate was tachycardic at 140s-150s beats per minute. Dr. Pruthi's note (timed at 11:37 a.m. of that day) indicates:

> "[The] patient [was] in respiratory distress[,] lungs bilaterally clear, known history of chronic hypertension and immune thrombocytopenia, non-compliant, blood pressure values noted, discussed [the] patient with [the] anesthesia [team]. Diagnoses: pulmonary edema, severe preeclampsia, pulmonary embolism. Decided to bring [the] patient to [the] operating room for intubation, stabilization, and delivery[.] [The] patient coded in [the] operating room [i.e., became unresponsive and pulseless, at 9:30 a.m.]. Ultrasound in [the] operating room [for] fetal heart rate [was at] 50 [beats per minute]. [The] patient [was] already [intubated] and code in progress. Advised immediate delivery [of the baby boy], [his] heart rate [was] less than 100 [beats per minute]. [The] baby [was] dried and given oxygen by mask, [his] heart rate [increased to] greater than 100, and [the] pediatricians continued resuscitation. [The patient regained her pulse at 9:46 a.m.]."[3]

Dr. Pruthi (together with Dr. Pile who arrived at patient's bedside at 9:14 a.m.) delivered the baby boy at 9:38 a.m. after making the first incision one minute earlier at 9:37 a.m. At five minutes of life, the baby boy was "vigorous, crying, [albeit] with decreased muscle tone and acrocyanosis, and started developing chest retractions." The baby was immediately transferred to the neonatal intensive care unit. The baby boy subsequently recovered. No claims in this action have been asserted on his behalf.

As the consequence of the 16-minute-long cardiac arrest from 9:30 a.m. to 9:46 a.m. on January 15, 2013, the patient suffered a "hypoxic encephalopathy without brain death." The patient was deemed to be in persistent vegetative state after 25 days of not waking up."

---

[3] Methodist's chart for the patient's January 15, 2013 hospitalization, pages 012-013 (abbreviations spelled out and typographical errors corrected).

[* 8]

On April 2, 2013, the patient was discharged from Methodist to nonparty Rutland Nursing Home where she passed away on December 27, 2016 from a cardiopulmonary arrest due to (or as a consequence of) diabetes mellitus and essential hypertension.

On a motion for summary judgment dismissing a medical malpractice cause of action, a defendant has the prima facie burden of establishing that there was no departure from good and accepted medical practice, or, if there was a departure, the departure was not the proximate cause of the alleged injuries. *Brinkley v. Nassau Health Care Corp.*, 120 A.D.3d 1287 (2d Dept. 2014); *Stukas v Streiter*, 83 AD3d 18, 24-26 (2d Dept. 2011). Once the defendant has made such a showing, the burden shifts to the plaintiff to submit evidentiary facts or materials to rebut the prima facie showing made by the defendant, so as to demonstrate the existence of a triable issue of fact. *Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 (1986); *Brinkley v. Nassau Health Care Corp.*, supra; *Fritz v. Burman*, 107 A.D.3d 936, 940 (2d Dept. 2013); *Lingfei Sun v. City of New York*, 99 AD3d 673, 675 (2d Dept. 2012); *Bezerman v. Bailine*, 95 AD3d 1153, 1154 (2d Dept. 2012); *Stukas v. Streiter*, at 24. A plaintiff succeeds in a medical malpractice action by showing that a defendant deviated from accepted standards of medical practice and that this deviation proximately caused plaintiff's injury. *Contreras v Adeyemi*, 102 AD3d 720, 721 (2d Dept. 2013); *Gillespie v New York Hosp. Queens*, 96 A.D.3d 901, 902 (2d Dept. 2012); *Semel v Guzman*, 84 AD3d 1054, 1055-56 (2d Dept. 2011). The plaintiff opposing a defendant physician's motion for summary judgment must only submit evidentiary facts or materials to rebut the defendant's prima facie showing. *Stukas*, at 24.

9

[* 9]

## Discussion

Dr. Pile, Dr. Martin, and Methodist have each established a prima facie entitlement to judgment as a matter of law through the submission of the patient's medical records and the detailed affirmations of their respective expert obstetricians,[4] each of whom opined within a reasonable degree of medical certainty that none of the respective defendants departed from the accepted standards of care and that any alleged departures were not a proximate cause of the patient's suffering a cardiac arrest and her subsequent death. *See Torres v Yakobov*, 222 AD3d 692, 693-694 (2d Dept 2023); *Getselevich v Ornstein*, 219 AD3d 1493, 1495 (2d Dept 2023).

In opposition to defendant's prima facie showing, plaintiffs' expert obstetrician has failed to raise a triable issue of fact for three principal reasons. *See Diaz v New York Downtown Hosp.*, 99 NY2d 542, 544 (2002); *Belak-Redl v Bollengier*, 74 AD3d 1110, 1111 (2d Dept 2010). First, plaintiffs' expert obstetrician improperly raised a new theory of liability in opposition to defendants' motions; namely, that defendants (individually and collectively) failed to refer the patient to a cardiologist for diagnosis and treatment of her cardiopathy (the "cardiologist-referral theory"). Plaintiff's expert states "It is my opinion that Dr. Martin, Dr. Pile, and Methodist Hospital . . . departed from good and accepted medical practice in failing to refer Ms. Clark to a cardiologist during her prenatal course. .

---

[4] *See* Expert Affirmation of Thomasena Ellison, M.D., dated December 20, 2023, on behalf of Dr. Pile; Expert Affirmation of Gary Mucciolo, M.D., dated February 23, 2024, on behalf of Dr. Martin; and Expert Affirmation of Taraneh Shirazian, M.D., dated February 21, 2024, on behalf of the Methodist defendants (NYSCEF Doc Nos. 142, 225, and 250, respectively).

10

[* 10]

. . in a patient such as Ms. Clark, good and accepted medical practice required referral to a cardiologist to follow the patient during the prenatal course for appropriate monitoring and testing. . . ."). *(Plaintiff's Expert Aff., pg. 8). See Mendoza v Maimonides Med. Ctr.*, 203 AD3d 715, 717 (2d Dept 2022). Second, plaintiffs' newly advanced cardiologist-referral theory is speculative in nature because it is based on a string of assumptions that are not supported by facts in the record and cannot raise a triable issue of fact as to whether the lack of such referral was a competent producing cause of the patient's injuries. (Plaintiff's Expert Aff., pg 8)   Plaintiff's expert stated "[H]ad a cardiology consult been appropriately completed, Ms. Clark's cardiomyopathy would have been timely diagnosed, and she would have delivered her baby before her cardiac arrest." *See Kiernan v Arevalo-Valencia*, 184 AD3d 727, 729-730 (2d Dept 2020); *Shahid v New York City Health & Hosps. Corp.*, 47 AD3d 800, 801-802 (2d Dept 2008), *partially overruled on other grounds by Stukas v Streiter*, 83 AD3d 18, 27 (2d Dept 2011). Third and finally, plaintiffs' expert obstetrician completely ignored the patient's departure from Brookdale's ER against medical advice on January 12, 2013 when she was experiencing a hypertensive urgency until her delayed presentation to Methodist's ER on January 15, 2013 by which time her hypertensive urgency had progressed to a hypertensive emergency.[5] *See Audette v Toussaint-Milord*, 201 AD3d 779, 780-781 (2d Dept 2022) (where, after delivery, the plaintiff did not permit defendant obstetrician or nurses to examine her uterus and left the hospital against medical advice, her medical malpractice claim that defendant obstetrician failed to diagnose her

---

[5] *See* Plaintiff's Expert Affirmation, page 6 (omitting from the recitation of facts the patient's presentation to Brookdale's ER on January 12, 2013).

11

with placenta increta, was dismissed on summary judgment because "any alleged departure was not a proximate cause of the plaintiff's injuries").

## Conclusion

Based on the foregoing, it is

**ORDERED** that in Seq. No. 8, Dr. Pile's motion for summary judgment is granted, and the amended complaint is dismissed as against her in its entirety without costs and disbursements; and it is further

**ORDERED** that in Seq. No. 10, Dr. Martin's motion for summary judgment is granted, and the amended complaint is dismissed as against him in its entirety without costs and disbursements; and it is further

**ORDERED** that in Seq. No. 11, the initial branch of the joint motion of Dr. Pruthi and Methodist for summary judgment dismissing the amended complaint as against Dr. Pruthi is granted without opposition, and the amended complaint is dismissed in its entirety as against Dr. Pruthi without costs or disbursements; and it is further

**ORDERED** that in Seq. No. 11, the remaining branch of the joint motion of Dr. Pruthi and Methodist for summary judgment dismissing the amended complaint as against Methodist is granted, and the amended complaint is dismissed in its entirety as against Methodist without costs or disbursements; and it is further

**ORDERED** that Dr. Pruthi and Methodist's joint counsel is directed to electronically serve a copy of this Decision/Order/Judgment with notice of entry on the

12

[* 12]

other parties' respective counsel and to electronically file an affidavit of service thereof with the Kings County Clerk.

This constitutes the Decision/Order/Judgment of the Court.

ENTER,

_____
J. S. C.

HON. ELLEN M. SPODEK

KINGS COUNTY CLERK
FILED
2024 SEP 30 A 10: 48

13

[* 13]